

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAY 0 9 2005

Betty A. Griess, Clerk
Cheyenne

Steven F. Freudenthal
FREUDENTHAL, SALZBURG & BONDS, P.C.
123 East 17th
P.O. Box 387
Cheyenne, WY 82003
(307) 634-2240

Ford T. Bussart
BUSSART, WEST & TYLER, P.C.
409 Broadway, Suite A
P.O. Box 1020
Rock Springs, Wyoming 82902-1020
(307) 362-3300

## IN THE UNITED STATES DISTRICT COURT FOR

## THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| OCI WYOMING, L.P., a Delaware Limited Partnership, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 03-CV-259B |
| PACIFICORP, an Oregon corporation, | ) ) | |
| Defendant. | ) ) ) | |

## MOTION TO SET ASIDE VERDICT OF ADVISORY JURY
## AND FOR LEAVE TO FILE POST-TRIAL BRIEF

Plaintiff, OCI Wyoming, L.P. ("OCI"), by and through its undersigned counsel, respectfully moves the Court to set aside the verdict rendered by the advisory jury (the "Advisory Jury") impaneled for the trial of this action and to issue an Order in the form attached hereto setting forth a schedule for post-trial briefing to assist the Court in issuing written findings of fact and conclusions of law. In support of its motion, OCI states as follows.

## BACKGROUND

This is an action for breach of contract by OCI against its electric power provider, PacifiCorp, seeking substantial damages resulting from power outages caused by PacifiCorp's breach of the Master Electric Services Agreement (the "Agreement") between the parties.  On April 12, 2005, the Court held the final pre-trial conference in this matter at which the Court announced that this matter was to be tried before an advisory jury pursuant to Rule 39 of the Federal Rules of Civil Procedure.[1]  Trial was held from April 25, 2005 to May 5, 2005, and an advisory jury was impaneled to hear the case.

Following trial, the Advisory Jury found that PacifiCorp had breached the Agreement. As to the damages OCI suffered as a result of that breach, the Advisory Jury concluded that of the nine outages of which OCI complained, OCI was entitled to total damages of $377,742 for losses incurred during the outages of April 21, 2001, November 8-9, 2002, and March 26, 2003. (These findings, collectively, constitute the "Verdict.")(A copy of the Verdict Form is attached as Exhibit B hereto)

## ARGUMENT

**I.    THE COURT MAY IGNORE, AND SHOULD SET ASIDE THE JURY'S VERDICT IN ISSUING ITS FINDINGS OF FACT AND CONCLUSIONS OF LAW.**

The conclusions of an advisory jury have no binding effect upon the disposition of a case. Although the court may consider the jury's findings of fact in reaching its own, ultimately the

---

[1] On April 5, 2005, the Court issued its Order Granting Waiver of Trial by Jury and Granting Request that This Matter be Tried to the Court, in which the Court granted the parties' joint motion that this matter be tried before the Court and without a jury.  (Exhibit A hereto)

Court is the finder of fact and must reach its own findings of fact and conclusions of law.[2] *See* Fed. R. Civ. Pro. 52(a) ("In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58."); *Smith v. Norwest Financial Wyo., Inc.*, 129 F.3d 1408, 1416 n. 6 (10th Cir. 1997)("*Smith II*")("The findings of an advisory jury are merely advisory. . . the court is responsible for the ultimate determination of facts"). A verdict by an advisory jury merely serves to advise the Court in its own determination of the findings of fact and conclusions of law the Court will apply in rendering a decision regarding the dispute at hand. Thus, the trial judge may accept or reject the findings of an advisory jury in his discretion. *See Smith v. Norwest Financial Wyo., Inc.*, 964 F. Supp. 327, 330, 333 (D. Wyo. 1996)("*Smith I*")(exercising discretion to set aside excessive damages awarded by an advisory jury), *aff'd Smith II*. Moreover, the trial court is free to find the facts without regard for those found by the advisory jury. *See E.E.O.C. v. General Lines, Inc.*, 865 F.2d 1555, 1562 (10th Cir. 1989)(stating further that the trial judge's factual findings would be reviewed under the "clearly erroneous" standard, notwithstanding the advisory jury's conflicting findings). Here, the Verdict of the Advisory Jury should be ignored by the Court in reaching its decision because the Verdict does not reflect the evidence adduced at trial nor faithfully applies the law as instructed by the Court.

---

[2] In accordance with U.S.D.C.L.R. 52.1, Plaintiff OCI has attached as Exhibit C hereto its proposed findings of fact and conclusions of law for this matter.

## II.   THE VERDICT IS CONTRADICTORY AND DOES NOT REFLECT THE EVIDENCE ADDUCED AT TRIAL.

The Verdict is contradictory on its face and does not allow the Court to properly gauge which of the nine outages the Advisory Jury found were caused by factors within PacifiCorp's control, thereby causing it to breach the Agreement. For instance, the Advisory Jury advised that it would award damages for the November 8-9, 2002 outages but not for the November 13, 2002 outage. The evidence adduced at trial demonstrated that both of these outages were caused by the same factor, a flashover of line-rupter 1H199 at Blacks Fork substation. Moreover, the evidence adduced at trial also showed that both outages resulted in similar types of damages to OCI. For this reason, it is impossible to know whether the Advisory Jury was expressing its proposed finding that the outage of November 13th was caused by a factor beyond PacifiCorp's control or whether it was making a proposed finding that OCI suffered no damages as a result of an otherwise "breaching" outage. Similarly, with regard to the outages of January 25, 2001; March 7, 2001; February 3, 2003; June 26, 2003, and December 22, 2003, the Court is faced with having to decipher whether the Advisory Jury advised that it found no breach for those outages, or rather found that the outage in question was a breach of the Agreement, but that OCI suffered no damages. For this reason, OCI respectfully asks that the Court resolve this conflict by issuing its own findings of fact and conclusions of law, based on the evidence presented at trial and as observed by the Court, in accordance with Rule 52(a).

The Advisory Jury also must have disregarded the evidence presented at trial in reaching the Verdict. The Advisory Jury obviously found that PacifiCorp had breached its contractual

obligations, with regard to at least some of the nine outages of which OCI complains. The Advisory Jury did, however, indicate to the Court that it would only find damages with respect to three of the nine outages. Both proposed findings are contrary to the evidence adduced at trial.

For instance, PacifiCorp did not produce any evidence that any of the outages at issue were caused by factors outside its control. Nor in its closing argument did PacifiCorp ever argue that the outages were caused by factors outside its control. OCI, however, presented substantial evidence that every outage was caused by factors within PacifiCorp's control. In fact, PacifiCorp put forth no explanations for the causes of the outages that would contradict the clear testimony of OCI's experts, Mr. Nelson and Mr. Linder.

Likewise, OCI produced substantial, and credible, evidence that every outage caused it to suffer injury of a similar nature--differing only in amount based on the severity of the outage. PacifiCorp, however, produced no evidence to dispute either the fact of damages or the amount of damages. For instance, PacifiCorp did not offer evidence to impeach or contradict the testimony of Mr. Rudoff that every outage resulted in lost production, with the vast majority of that being material in process that was dumped on the floor. Instead, OCI offered uncontroverted evidence of the substantial damages it suffered as a result of the power outages caused by PacifiCorp.

Here, the Advisory Jury obviously did not follow the Court's instruction on lost volume damages (Instruction #15), and the Advisory Jury's conclusions as to damages were "clearly, decidedly or overwhelmingly against the weight of the evidence." *See Black v. Hieb's Enters, Inc.*, 805 F.2d 360, 363 (10th Cir. 1986). Moreover, a jury is not permitted to disregard proven

damages in fixing its verdict. *See id.* at 362. In *Brown v. Richard H. Wacholz, Inc.*, the Tenth Circuit reversed the trial court where the record contained undisputed evidence that the plaintiff had incurred medical and hospital expenses and had endured pain and suffering as the result of a permanently-disabling physical injury but the jury awarded the plaintiff only his medical and hospital expenses. 467 F.2d 18, 21 (10th Cir. 1972).

For these reasons, it is impossible to tell from the Verdict what advice the Advisory Jury wished to pass on to the Court with regard to its findings of fact. That being the case, OCI believes that the Court, in issuing its findings of fact and conclusions of law pursuant to Rule 52, would benefit from the filing of post-trial briefs by the parties in which the parties set forth their contentions of the facts as proven at trial and how those facts should be applied to the applicable legal principles.

## CONCLUSION

WHEREFORE, OCI respectfully requests that this Court enter an order in the form attached setting a schedule for the parties to file post-trial briefs to assist the Court in issuing its findings of fact and conclusions of law in this matter.

FREUDENTHAL, SALZBURG & BONDS, P.C.

Steven F. Freudenthal
123 East 17th Street
P.O. Box 387
Cheyenne, Wyoming  82003-0387
(307) 634-2240

Attorneys for Plaintiff OCI WYOMING, LP

*OF COUNSEL:*

BUSSART, WEST & TYLER, P.C
Ford T. Bussart
409 Broadway, Suite A
P.O. Box 1020
Rock Springs, WY 82902
(307) 362-3300


ASHBY & GEDDES
Lawrence C. Ashby
James McC. Geddes
Philip Trainer, Jr.
Richard L. Renck
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
Dated: May 9, 2005

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on the 9th day of May, 2005, I served OCI's Motion to Set Aside Verdict of Advisory Jury and for Leave to File Post-Trial Brief and a proposed Order Granting OCI Wyoming, L.P.'s Motion to Set Aside Verdict of Advisory Jury and for Leave to File Post-Trial Brief by depositing a true and correct copy thereof in the United States mail, at Cheyenne, Wyoming, with postage prepaid and addressed to the following attorneys of record in the above-entitled action:

Stuart R. Day
Williams, Porter, Day & Neville, P.C.
P.O. Box 10700
Casper, WY 82602-3902

Paul J. Hickey
Roger Fransen
Hickey & Mackey
P.O. Box 467
Cheyenne, WY 82003-0467

Steven F. Freudenthal

**EXHIBIT A**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

APR   5 2005
3:25 pm
Betty A. Griess, Clerk
Cheyenne

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| OCI WYOMING, L.P., a Delaware limited partnership, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 03-CV-259-B |
| -vs- | ) ) | |
| PACIFICORP, an Oregon corporation, | ) ) | |
| Defendant. | ) ) ) | |

## ORDER GRANTING WAIVER OF TRIAL BY JURY AND GRANTING REQUEST THAT THIS MATTER BE TRIED TO THE COURT

The Court having reviewed the joint motion of the parties for an Order Granting Waiver of Trial by Jury and Granting Request that this Matter be Tried to the Court, and it appearing to the Court that good cause exists therefor,

IT IS HEREBY ORDERED:

1.     The joint motion of the parties for waiver of trial by jury in this matter be, and the same is hereby, granted.

2.     The joint motion of the parties that this matter be tried to the Court be, and the same is hereby, granted.



3.      This matter shall be tried to the Court, sitting without a jury, commencing at

9:30 a.m. on April 25, 2005.

DATED this _5th_ day of _April_ , 2005.

BY THE COURT:

_[signature]_

**EXHIBIT B**



FILED
DISTRICT OF WYOMING
MAY 0 5 2005
CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

OCI WYOMING, L.P., a Delaware )
Limited Partnership, )
                                  )
        Plaintiff, )
                                  )
           vs. )       Case No. 03-CV-259-B
                                  )
PACIFICORP, an Oregon )
corporation, )
                                  )
        Defendant. )

---

## VERDICT

---

We the jury, duly empanelled to hear the above-captioned case, hereby find the following answers to the questions presented by the Court to the jury:

1. Considering all of the evidence, do you, by a preponderance of the evidence, find that Plaintiff OCI proved that Defendant PacifiCorp breached the Master Electric Service Agreement with Plaintiff OCI?

Yes__X__                  No_____

If you answered "Yes" to question 1, then proceed to question

2.   If you answered "No" to question 1, then have the Presiding Juror sign and date the Verdict and notify the bailiff.


2.   Considering all of the evidence, do you, by a preponderance of the evidence, find that Plaintiff OCI suffered damages as a direct and proximate result of any of the following outages?

| | | |
|---|---|---|
| January 25, 2001 | Yes_____ | No___X___ |
| March 7, 2001 | Yes_____ | No___X___ |
| April 21, 2001 | Yes___X___ | No_____ |
| November 8-9, 2002 | Yes___X___ | No_____ |
| November 13, 2002 | Yes_____ | No___X___ |
| February 3, 2003 | Yes_____ | No___X___ |
| March 26, 2003 | Yes___X___ | No_____ |
| June 26, 2003 | Yes_____ | No___X___ |
| December 22, 2003 | Yes_____ | No___X___ |

If you answered "Yes" in regards to any outage date referenced in question 2, then proceed to question 3. If you answered "No" in regards to all outage dates, then have the Presiding Juror sign and date the Verdict and notify the bailiff.

2

3.   Considering all of the evidence, has Plaintiff OCI proved by a preponderance of the evidence that it is entitled to damages?

Yes __X__           No_____

If so, state that amount:  $ _377,742.00_ .

Dated this __5-th__ day of May, 2005.

_____Angela Ellcrett_____
Presiding Juror

3

**EXHIBIT C**

Steven F. Freudenthal
FREUDENTHAL, SALZBURG & BONDS, P.C.
123 East 17th
P.O. Box 387
Cheyenne, WY 82003
(307) 634-2240

Ford T. Bussart
BUSSART, WEST & TYLER, P.C.
409 Broadway, Suite A
P.O. Box 1020
Rock Springs, Wyoming  82902-1020
(307) 362-3300/(302) 362-3309 - Fax

## IN THE UNITED STATES DISTRICT COURT FOR

## THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **OCI WYOMING, L.P., a Delaware Limited Partnership,** | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **C.A. No. 03-CV-259B** |
| **PACIFICORP, an Oregon corporation,** | ) ) ) | |
| Defendant. | ) ) | |

## PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

As required by U.S.D.C.L.R. 52.1, plaintiff OCI Wyoming, L.P. ("OCI"), through its

undersigned counsel, respectfully submits the following Proposed Findings of Fact and

Conclusions of Law for the Court's consideration in this matter:

**Proposed Findings of Fact**

1. OCI operates a mine and refinery facility near Green River, Wyoming, that mines trona ore and refines the ore into soda ash. OCI sells the vast majority of its refined product pursuant to fixed contracts and sells all the soda ash it produces.

2. The continuous mining and refining processes at the OCI facility draw significant electrical loads. OCI's facility draws an average of 70 mW of electricity.

3. OCI's electrical needs are served by defendant PacifiCorp, with OCI serving as one of PacifiCorp's largest customers in Wyoming.

4. In August 1997, PacifiCorp and OCI entered into a Master Electric Service Agreement (the "Agreement") to govern their relationship as electric service provider and customer.

5. The Agreement was heavily negotiated by the parties.

6. Because OCI had experienced significant problems as a result of power outages in 1996, it negotiated for, and received, terms in the Agreement that required PacifiCorp to provide a level of service that was higher than generally required for service to electrical customers not being served pursuant to a special contract.

7. The Agreement provides that "PacifiCorp shall furnish and OCI shall take and pay for OCI's Net Firm Power and Energy requirements."

8. The parties also negotiated a "Force Majeure" provision, excusing performance only for outages caused by acts or factors beyond the control of the parties.

2

9. The negotiations over the Agreement also focused on the construction of new electrical distribution facilities that were intended to more reliably serve an expanding load at OCI.

10. PacifiCorp presented four options to OCI. First, there were two options that included renovations to the existing Westvaco substation. OCI rejected these two options because they both would have left OCI subject to the same faults on PacifiCorp's distribution system that they were trying to avoid. The second two options related to the construction of an entirely new substation on PacifiCorp's distribution system.

11. As a result of those negotiations, the parties agreed that they would share the costs for the construction of a new substation, the Raven substation, to immediately serve OCI and PacifiCorp's distribution system with its other customers.

12. PacifiCorp presented OCI with several "add ons" for the Raven substation—one of which was the installation of permissive overreaching relays on PacifiCorp's transmission system leading into the substation. At the time, the proposed cost for adding such relays was stated to be over $945,000—the cost of which PacifiCorp wanted OCI to bear exclusively.

13. Because relays on the transmission side of the new substation would not only protect OCI, but also other PacifiCorp customers, from faults on the historically reliable transmission system, OCI did not believe it should finance PacifiCorp equipment on PacifiCorp's transmission system and elected not to install the relays. Moreover, PacifiCorp's prior history in operating the transmission line gave no indication that

3

(1) the relays were needed to protect OCI from future outages, or (2) PacifiCorp would begin a significant construction project on its transmission system that would have a disastrous effect on the reliability of its transmission system.

14. PacifiCorp never told OCI that it could not provide the level of service required by the Agreement without the relays on the transmission side of the new substation.

15. For three years after the construction of the Raven substation, OCI enjoyed reliable electric service. However, in 2001, OCI began to experience a string of outages from faults on the transmission system that one of PacifiCorp's agents characterized as the worst he had seen in 33 years.

16. On January 25, 2001, and March 7, 2001, OCI experienced outages caused by the settling of a microwave tower that is used for communications on PacifiCorp's transmission system. The evidence shows that PacifiCorp knew about the problems with the microwave system well before the first outage. Ultimately, it was within PacifiCorp's control to design, construct, and maintain a microwave communications system that would not have caused these outages, and then, when aware of problems with the microwave system, it was within PacifiCorp's power to repair it and/or prevent it from affecting the distribution and transmission systems. PacifiCorp did neither and allowed two outages to occur before addressing the problem.

17. OCI experienced a third outage in four months on April 21, 2001. The initial fault on the transmission system was caused by a broken guy wire on the 230 kV line serving another PacifiCorp customer. This fault was carried to the OCI facility because a

4

breaker at PacifiCorp's Monument substation was "gummed up" and failed to operate. Although within its power and control to do so, PacifiCorp failed to properly maintain this breaker in accordance with its own preventative maintenance schedule, thus causing another serious outage at OCI's facility that could have been avoided.

18. OCI also experienced two related outages on November 8-9, 2002 and November 13, 2002. These outages were caused by the failure of an underrated—and contaminated—switch at PacifiCorp's Blacks Fork substation. PacifiCorp's application of 161 kV equipment on its 230 kV system is improper in the elevated environment in which these switches are operated. Moreover, PacifiCorp's improper response to the outage on November 8–9 unnecessarily prolonged that outage and set the stage for the second failure of that same switch on November 13th. For these reasons, both the November 8-9 and the November 13th outages were caused by factors within the direct control of PacifiCorp.

19. On February 3, 2003, OCI experienced an outage, resulting in OCI losing a full day of production, as a result of improper switching procedures by PacifiCorp's agents and/or employees.

20. On March 26, 2003, OCI suffered another outage at its facility that was caused by the third failure of the same switch that caused the November 8th, 9th and 13th outages described above. After the two previous failures of this switch, it was within PacifiCorp's power to remove this switch from service—something it did not do.

21. On June 26, 2003, another of PacifiCorp's switches at the Blacks Fork substation failed to properly operate after it had been moved within the substation and was improperly reset by PacifiCorp's agents and/or employees.

22. OCI suffered another electrical outage on December 22, 2003. This outage was caused by improper work on a relay panel at the Monument substation by a PacifiCorp employee and/or agent who allowed an errant screwdriver to come in contact with a panel on which he was working, which de-energized the whole transmission line from Monument to Rock Springs.

23. In addition to having the power to control the individual causes of the outages experienced by OCI, PacifiCorp also had the ultimate control over whether OCI would have been affected by these outages on the transmission system, as well as for what length of time an outage lasts. Most, if not all, of the outages at OCI would have been prevented had relays been installed on the transmission side of the Raven substation. At all times, PacifiCorp controlled whether or not those relays were installed—either by (1) installing them itself (no matter whether the expenditure could be included in the rate base) or (2) refusing to sign the Agreement committing to provide the level of service it did until relays were installed at Raven.

24. OCI's continuous mining and refining processes come to an immediate and unplanned halt when OCI experiences electrical outages. Among the problems OCI experiences during and after a power outage are: (1) the significant damage that can occur to its motors and equipment when they are improperly shut down; (2) the need

to "flush" or "wash out" the partially processed ore before it hardens in OCI's equipment; (3) the daunting obstacles OCI faces in an orderly restart of its production processes; and (4) the inability to produce refined soda ash.

25. The evidence at trial demonstrates that OCI has experienced the following damages as a result of outages caused by factors within PacifiCorp's control:  $4,771,180 in lost production; $333,248.87 in surplus freight charges; $516,399.68 in increased utility usage; and $411,064.45 in increased labor and maintenance costs.

## Conclusions of Law

1.  The Agreement between PacifiCorp and OCI is a binding contract and controls the nature of their relationship for the entire period in question.

2.  Pursuant to the Agreement, PacifiCorp agreed to provide Firm Power to OCI and is only excused from that performance where its failure results from causes beyond PacifiCorp's control.

3.  All of the outages that are the subject of OCI's complaint were caused by factors that were within the exclusive control of PacifiCorp.

4.  It was also within PacifiCorp's control to install relays on the transmission side of the Raven substation that would have protected OCI from faults on that transmission system.

5.  At all times, PacifiCorp took the risk that it would not be able to perform its obligations under the contract without the installation of relays at Raven.

6.  Because OCI experienced outages as a result of factors that were within PacifiCorp's control, PacifiCorp was not excused from its performance under the Agreement. For that reason, PacifiCorp breached the Agreement.

7.  OCI suffered damages during each of the outages highlighted in the complaint.

8.  OCI has demonstrated that it is a lost volume seller of soda ash and has proven its damages with reasonable certainty.

9.  The evidence at trial demonstrated that OCI suffered the following damages as a result of PacifiCorp's breach of the Agreement: $4,771,180 for lost production,

8

$333,248.87 for surplus freight charges, $516,399.68 for increased utility usage,

and $411,064.45 for increased labor and maintenance costs.

10.   The Court finds in favor of the Plaintiff in the amount of $6,031,893.

FREUDENTHAL, SALZBURG & BONDS, P.C.

_____

Steven F. Freudenthal
123 East 17th Street
P.O. Box 387
Cheyenne, Wyoming  82003-0387
(307) 634-2240

Attorneys for Plaintiff OCI WYOMING, LP

*OF COUNSEL:*

BUSSART, WEST & TYLER, P.C
Ford T. Bussart
409 Broadway, Suite A
P.O. Box 1020
Rock Springs, WY 82902
(307) 362-3300

ASHBY & GEDDES
Lawrence C. Ashby
James McC. Geddes
Philip Trainer, Jr.
Richard L. Renck
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

Dated: May 9, 2005
155854.1

9